**Alan B. MILLER, as Trustee in Bankruptcy of American IBC Corp., Bankrupt, Plaintiff,**

v.

**WELLS FARGO BANK INTERNATIONAL CORP., Defendant.**

No. 74 Civ. 3714(MP).

United States District Court, S. D. New York.

Dec. 22, 1975.

Weil, Gotshal & Manges, New York City, for plaintiff; Charles Seligson, Harvey R. Miller, Robert A. Weiner, and Fredric J. Leffel, New York City, of counsel.

Dunnington, Bartholow & Miller, New York City, for defendant; Charles L. Stewart, Gerald E. Ross, and Roger R. Crane, Jr., New York City, of counsel.

## OPINION AND FINDINGS

POLLACK, District Judge.

This is a plenary suit by a trustee in bankruptcy to recover, as voidable preferences, two loan repayments made by the bankrupt to the defendant bank in November 1973. Jurisdiction is conferred on the Court by 11 U.S.C. § 46 and 28 U.S.C. § 1331. The case was presented at a bench trial and has been fully briefed by the parties.

The plaintiff, a Trustee in Bankruptcy of American IBC Corporation (hereafter "AIBC"), was appointed on April 2, 1974. AIBC is a Delaware corporation which, among other activities, engaged in international currency transactions and other overseas investment. Its principal offices were in New York City. The defendant Wells Fargo Bank International (hereafter the "New York Bank"), an international bank which is a wholly owned but independently operated subsidiary of Wells Fargo Bank, N.A., of San Francisco, also maintains its principal office in New York City.

In April 1973 AIBC wished to engage in currency arbitrage involving dollars and Swiss Francs. It approached the New York Bank with whom it had a relationship and two loan transactions resulted. The New York Bank made two six-month loans of $1,000,000 each to AIBC on May 3 and 17, 1973, respectively, which were to be repaid in full in November of that year. AIBC used the funds in two separate currency arbitrage transactions with the Swiss Credit Bank in Zurich (hereafter, the "Swiss Bank") in which the dollars were first exchanged into Swiss Francs, the latter were held in interest-bearing time depos-

its in Europe, and on maturity thereof six months later the Swiss currency was exchanged back into dollars at a rate of exchange which was fixed initially and was favorable to AIBC.[1]

The arbitrage transactions proceeded according to plan, and the New York Bank received repayment of the two loans, with interest, on the maturity dates of November 2 and November 19, 1973. Within four months thereafter, however, an involuntary petition in bankruptcy was filed against AIBC, on January 29, 1974, and the company was adjudicated bankrupt on February 14, 1974.

The New York Bank has put forward a number of different legal theories to support its contention that the two loan repayments are beyond the reach of the bankruptcy statutes, and did not constitute preferential transfers voidable by the Trustee. The Bank argues, alternatively, that (1) it was a secured party in that the two loans were secured by pledges of the Swiss Franc time deposits and the repayments were merely the liquidation of the collateral; (2) that it became an assignee in May of either the Swiss Franc time deposits or AIBC's

right to receive dollars under the foreign exchange contracts with the Swiss Bank; (3) as to the second loan, the November 19 repayment was not a transfer of the bankrupt's property because AIBC had already assigned those funds in August to the Swiss Bank, which forwarded them to New York by mistake in November; and (4) without regard to the pledge or assignment theories, the satisfaction of the loans by debits to AIBC's account in November constituted a valid set-off by the New York Bank beyond reach of the Trustee. The defendant also denies the Trustee's contention that it had reasonable cause to believe AIBC was insolvent at the times of the loans and repayments.

On the basis of the record, the Court finds that the two repayments to the defendant Bank, on November 2 and 19, 1973, constituted preferential transfers under § 60 of the Bankruptcy Act, 11 U.S.C. § 96; and since the Court also finds that the defendant Bank had reasonable grounds to believe AIBC was insolvent in November 1973, the funds may be recovered by the Trustee for the benefit of the bankrupt's estate. As is discussed hereinafter, none of the Bank's

---

1. The first loan was for $1,000,000 on May 3, 1973 at 8% interest, to be repaid on November 2, 1973. On May 3, AIBC purchased 3,240,000 Swiss Francs from Swiss Credit Bank in Zurich to be sold to it for dollars six months later. In the interval, AIBC opened a time deposit with the Swiss Francs at 4.25% with Wells Fargo Bank in Luxembourg.

The Swiss Franc time deposit matured on November 2, and the resulting 3,309,997.50 Swiss Francs were forwarded to the Swiss Bank for exchange into dollars at an exchange rate, fixed in May, which was more favorable to AIBC than the rate which governed the May exchange into Swiss Francs. The Swiss Bank then forwarded the resulting $1,042,814.37 (retaining an unexpected surplus of 1,147.50 Swiss Francs in AIBC's account with it) to the New York Bank for AIBC's account.

The New York Bank credited AIBC with the transfer and debited AIBC's account for $1,040,666.67, representing the principal and interest due the Bank; AIBC's account retained a profit of $2,147.70 which arose from the differential in the two rates of exchange, as reduced by the differential in the rates of interest it paid for the borrowed funds and

received for the time deposit. The May contract placed the risk of fluctuations in the relevant exchange rate in November on the Swiss Bank.

The second transaction followed a similar pattern. AIBC borrowed $1,000,000 at 8.5% interest from the New York Bank on May 17, 1973, due November 19, and purchased 3,130,-000 Swiss Francs from the Swiss Bank on the same date. AIBC and the Swiss Bank contracted for an exchange of the Swiss Francs back into dollars on November 19 at a fixed rate, favorable to AIBC. In the interval, AIBC placed the Swiss Francs in a six-month 3.25% time deposit at United California Bank in London. The time deposit matured on November 19, and the London Bank forwarded the resulting 3,183,577.83 Swiss Francs to the Swiss Bank for exchange into $1,046,894.05. The latter sum was then sent to the New York Bank for AIBC's account, which credited AIBC with the transfer and debited AIBC's account $1,043,916.67 in repayment of the principal and interest due the Bank for the May 17 loan. The remaining $2,977.38 was left in AIBC's New York account as its profit on the transaction.

legal theories is supported in the evidence; they are in the nature of *ex post facto* rationalizations which are neither persuasive nor tenable.

## I. The Elements of a Preference

A transfer is preferential under § 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96(a)(1), only if it satisfies all the elements of that statute. It must (1) transfer the property of the debtor, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt, (4) at a time when the debtor is insolvent, (5) within four months before the filing of a bankruptcy petition, and (6) enable one creditor to obtain a greater percentage of his debt than some other creditor of the same class. In addition, the trustee may void a transfer deemed preferential under § 60(a)(1) only if, under § 60(b), the creditor receiving it had reasonable cause to believe the debtor was insolvent at the time the transfer was made.

It is apparent that, if the defenses of the defendant Bank fall, all six elements of a preferential transfer are present in the facts of this case. The repayments on November 2 and 19 were made from the bankrupt's assets[2] for the benefit of the New York Bank, its creditor, in order to extinguish the antecedent debts incurred by the bankrupt the preceding May. Furthermore, the parties have stipulated that AIBC was insolvent at all times on and after June 1, 1973; the payments in November took place within four months of the filing of the bankruptcy petition in January, and the defendant Bank, by receiving payment in full of the bankrupt's obligations, clearly received a greater percentage of its debt than similarly-situated bankruptcy claimants. All that remains for the Trustee to prove is that the defendant Bank had reasonable cause to believe AIBC was insolvent at the time the payments were made.

This analysis of the facts must be altered considerably, however, if any of the defendant's defenses mentioned previously are sustained. The New York Bank's pledge and assignment theories affect the dates on which the transfers of AIBC's property would be deemed to

**2.** Apart from the contention raised by the defendant that the repayment of the second loan was made out of funds belonging to the Swiss Bank because of an assignment made to that bank by AIBC in August 1973 (for which see discussion, *infra*), a question was raised at trial that both of the November payments might have been transfers of the Swiss Bank's property. The Swiss Bank transferred the dollars it sold AIBC in return for the latter's Swiss Francs to the New York Bank in favor of AIBC's account. AIBC also maintained an account with the Swiss Bank; the question arose because the Swiss Bank did not record a debit on AIBC's ledger account with it to reflect the transactions until some time after the events took place. Thus, an examination of the Swiss Bank's books on the date of the payments might suggest it was the Bank's, not the bankrupt's, money which was transferred to New York.

The Swiss Bank's delayed bookkeeping entries should have no effect on the outcome of these proceedings, however. *See McKenzie v. Irving Trust Co.*, 292 N.Y. 347, *aff'd*, 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945). A preferential transfer may be "indirect" under § 1(30) of the Bankruptcy Act, and the use of a circuitous arrangement involving a third party to effect a transfer from debtor to creditor does not immunize a payment from attack as a preference. *National Bank v. National Herkimer County Bank*, 225 U.S. 178, 184, 32 S.Ct. 633, 56 L.Ed. 1042 (1912); *Smyth v. Kaufman*, 114 F.2d 40 (2d Cir. 1940). The payment would be deemed to come from the bankrupt's property even if the Swiss Bank's delayed debiting on AIBC's account renders its transfer of funds to New York a loan by it to the bankrupt. It is true that a loan by a third party to a bankrupt which is paid directly to the bankrupt's creditor is not considered a transfer of the bankrupt's property where the lender designates the recipient of the funds, for in that case the funds have never been even potentially available to other creditors. Where such control by the lender is absent, however, as here, the transfer is deemed to come from the bankrupt's estate. *See Smyth v. Kaufman, supra; Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2d Cir. 1938); *Inter-State National Bank v. Luther*, 221 F.2d 382, 393 (10th Cir. 1955), *cert. dismissed*, 350 U.S. 944, 76 S.Ct. 297, 100 L.Ed. 823 (1956). Moreover, it is clear that no loan was involved in this case. The Swiss Bank acted merely as a conduit: it took AIBC's Swiss Francs, exchanged them for dollars, and forwarded the result to New York.

have occurred under the Bankruptcy Act, for § 60(a)(2) of the Act defines the time a transfer occurs as "the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee."[3] Thus, the transfers at issue here would not be deemed to have taken place within four months of bankruptcy if a valid pledge or assignment had been furnished to the defendant and had become enforceable against third parties prior to that time. *See Bachner v. Robinson*, 107 F.2d 513, 515 (2d Cir. 1939). As to the New York Bank's other defenses, a valid set-off is accorded statutory protection from preference attack; and the allegation that the second loan repayment came from the assets of the Swiss Bank, not the bankrupt, rebuts the existence of the first element of a preferential transfer.

Consequently, in order to determine whether the two November payments constituted a voidable preference, this Court must first decide whether the defendant Bank had reasonable cause to believe that the bankrupt was insolvent in November 1973; if it did, the Court must then evaluate each of the defenses asserted by the New York Bank. Since the details of the two loans vary, the analysis of the defendant's pledge and assignment theories will be undertaken separately for each loan.

## II. Reasonable Cause to Believe AIBC Insolvent

The Trustee need not prove that the New York Bank had actual knowledge of the bankrupt's insolvency in order to defeat a preferential transfer under § 60(b) of the Bankruptcy Act. Instead, the plaintiff need show only that the transferee had "reasonable cause to believe that the debtor [was] insolvent" at the time the transfer was made. Section 60(b), 11 U.S.C. § 96(b)

(1970); 3 *Collier on Bankruptcy* ¶ 60.36, at 913 (14th ed. 1975) (hereafter "*Collier*").

A "mere suspicion" that the transferor is insolvent does not constitute "reasonable cause." *Grant v. First National Bank*, 97 U.S. 80, 24 L.Ed. 971 (1878); *In re Hygrade Envelope Corp.*, 366 F.2d 584 (2d Cir. 1966). Reasonable cause is established, however, where the creditor has notice of "such a state of facts . . respecting the affairs and pecuniary condition of the transferor as would lead a prudent business person to the conclusion that the transferor is insolvent." *Robinson v. Commercial Bank of North America*, 320 F.2d 106, 107 (2d Cir. 1963). Moreover, the creditor may not "close his eyes" to preserve his ignorance of the debtor's true condition, and is chargeable with notice of all facts which a reasonably diligent investigation would have disclosed, where a person of ordinary prudence would have made inquiry. *Id.* The New York Bank may not be absolved from a duty of inquiry because, believing itself a secured creditor, it did not need to look to the bankrupt's financial standing as the basis for its decision to extend credit. *See Clower v. First State Bank*, 343 F.2d 808, 811 (5th Cir. 1965) (bank held to reasonable cause standard, including duty of inquiry, despite its reliance on solvent accommodation endorser of debtor's note). *See also G. F. Wertime, Inc. v. Turchick*, 358 F.2d 802 (2d Cir. 1966). The Bankruptcy Act makes no exception to its reasonable cause requirement in favor of creditors who do not rely on the credit standing of their debtors. *See Clower v. First State Bank, supra*.

The defendant Bank emphasizes that it received its loan repayments precisely as had been scheduled six months earlier, and that it did conduct a general credit check of AIBC in the fall of 1973 which produced no adverse reports from the other banks with whom the bankrupt did

---

**3.** Whether or not creditors actually existed who might have obtained such a lien has no bearing on the time the transfer is deemed to

occur. Bankruptcy Act, § 60(a)(3), 11 U.S.C. § 96(a)(3) (1970).

business. The Bank submitted in evidence a Dunn & Bradstreet business information report on AIBC dated October 3, 1973 which listed the company's "record" as "clear". Finally, while the documentary evidence shows that the New York Bank was aware in the summer of 1973 that the Banco de la Republica in Bogota, Colombia, was suspicious of AIBC and had severed relations with it in a dispute over an international currency transaction, the defendant has demonstrated in the record that it was advised in September 1973 that the problem had been resolved and the whole matter settled by AIBC.

Nonetheless, there is no doubt that the New York Bank had notice of facts which would have led a prudent business person to the conclusion that AIBC was insolvent, or which at the very least would have incited a man of ordinary prudence to make inquiry of AIBC's affairs. *In re Hygrade Envelope Corp., supra,* 366 F.2d at 586–587.

We start with the undeniable fact that the Bank did not regard AIBC as generally creditworthy and anticipated obtaining full security in any transactions with it. The New York Bank was aware that AIBC was very thinly capitalized—according to the financial information in the Bank's possession, the company had a net worth of $105,000 and a tangible net worth of $84,000.[4] It seems incontrovertible that if the Bank were to learn that AIBC had suffered a serious financial reverse and had not made any off-setting improvement in its capitalization, the Bank would have reasonable cause to believe AIBC was insolvent under the balance sheet test of the Bankruptcy Act, § 1(19), 11 U.S.C. § 1(19) (1970). That is precisely what the Bank did learn.

AIBC acquired a number of assets in Colombia in 1972 which were reflected in its financial statement at a valuation of approximately $3,000,000. In order to maintain a low profile as a foreign investor, AIBC apparently arranged to have the assets managed as Colombian entities by its two Colombian vice presidents, Luis Lara and Gonzalo Ospina. At some point in late 1972 or early 1973 Lara and Ospina allegedly misappropriated AIBC's Colombian investments; they ceased to be employed by the company in February 1973. Negotiations began regarding the disputed assets, and a settlement was reached, though not consummated, on April 25, 1973. The New York Bank was entirely aware of the proposed settlement since it was to act as escrow agent in connection with the fulfillment of the settlement's terms.

Although the effect the settlement would have had on AIBC had it been consummated is not entirely clear on the record before the Court,[5] no implementation of the provisions of the settlement

---

**4.** These figures appear on the financial analysis performed by the New York Bank's credit officer. The financial statement of AIBC dated May 31, 1972, which the officer made use of, lists a net worth of $167,593.17. This difference has no effect on the instant discussion.

**5.** The settlement agreement provided that (1) Lara and Ospina would pay AIBC $1,000,000, of which $100,000 would be in cash and the remainder in a series of promissory notes; (2) AIBC would release Lara and Ospina from a series of promissory notes they had already given AIBC totalling $1,250,000; and (3) AIBC would arrange to have discharged a $3,000,000 debt owed by Lara and Ospina to United Brands, of which AIBC was the guarantor. The settlement envisaged that AIBC would enter into an agreement with United Brands in which the latter would extinguish the debt in exchange for the transfer to it of a complete or partial interest in AIBC's Colombian assets.

The loss of AIBC's Colombian assets would be offset by the discharge of its guarantee of Lara and Ospina's obligation to United Brands; both were carried on AIBC's balance sheet, on opposite sides, at approximately $3,000,000. Hence, the net effect of the settlement on AIBC might have been a loss of $250,000, which was the difference between the value of the promissory notes it was extinguishing and those it was to receive. However, it is not clear whether the existing series of notes totalling $1,250,000 was reflected on AIBC's 1972 financial statement; if it was not, the loss would not necessarily have affected the net worth figure calculated on the basis of that statement. It should be noted that AIBC's president testified at trial that the proposed settlement represented a loss to AIBC of some $2,000,000.

ever took place. The New York Bank was also aware of that fact, since it had been instructed that the arrangement would be terminated on a given date unless it had been advised, as escrow agent, that a subsequent agreement had been reached; the Bank was never so advised.[6]

Thus, the Bank was aware that AIBC was in jeopardy of losing—and indeed might already have lost—up to $3,000,000 of its assets.[7] Moreover, the very terms of the proposed agreement, of which the Bank was clearly aware, provided that in the event the settlement were terminated Lara and Ospina were to be released from a pre-existing debt to AIBC of $1,250,000. Given AIBC's net worth, the Bank's awareness of those facts constituted more than "mere suspicion." At the very least it gave rise to a duty to investigate AIBC's financial affairs, which investigation would have disclosed the uncontroverted fact that AIBC was insolvent, at least after June 1, 1973. Indeed, when the Bank eventually did conduct an inquiry in December 1973, it concluded that AIBC's insolvency was attributable in large part to the "fiasco in Colombia" through which it "lost lots of assets."

The Bank also ignored other signals, apart from the Colombian episode, which suggested the seriousness of AIBC's condition. AIBC was not responsive to the Bank's requests for financial statements for the 1973 fiscal year; indeed, the very Dunn and Bradstreet report the Bank relies upon indicated that the bankrupt had "declined all financial information." Moreover, AIBC did not answer the Bank's belated request, in August 1973, for a signed promissory note in connection with the second loan which had been granted the preceding May. Finally, while relevant only to the second loan payment, the Bank learned on November 9 and 11, 1973 in the course of its general credit check that Chemical Bank had closed AIBC's account and that National Bank of North America refused to comment on its relationship with the company.

Although these items alone are not dispositive, in conjunction with the evidence concerning the loss of AIBC's Colombian assets they support the inference and conclusion that the Bank's failure to obtain prompt explanations of the omissions and unresponsiveness mentioned and to conduct a diligent inquiry into AIBC's financial affairs represented an inexcusable indifference to what could be ascertained and to the truth, which may not be condoned at the expense of other creditors in bankruptcy.

---

**6.** The Bank was instructed in a letter from AIBC dated May 1, 1973 to forward all of the promissory notes which had been deposited with it in escrow to Lara and Ospina 120 days after the deposits were made if AIBC had not succeeded in reaching an agreement with United Brands, as discussed in note 5, *supra*, before that time expired. The record does not show if the escrow deposits were ever made, so it is difficult to determine the date on which the Bank became aware that the settlement had fallen through. Regardless of the particular date, the defendant's contention that AIBC's continued existence as a corporate entity from May through November compels a finding that the Bank had ceased to have any cause to believe AIBC was insolvent in November is nothing short of frivolous.

The Bank also argues, on the basis of some ambiguous trial testimony of one of its officers, that it had refused to act as AIBC's escrow agent in May, and thus never learned that the settlement agreement failed. Even if the testimony is credited, the Bank may not contend that it was not advised of the terms of the proposed settlement, including its highly contingent nature. The defendant was therefore on notice that AIBC was in an extremely dangerous position—one which a person of ordinary prudence would deem worthy of additional inquiry in light of AIBC's minimal capitalization.

**7.** The Bank maintains that if AIBC lost its assets in Colombia it would also have been discharged from liability on its guarantee of Lara's and Ospina's $3,000,000 debt to United Brands; consequently, there would have been no net effect on AIBC's balance sheet. Yet the liquidation of the United Brands debt—and AIBC's liability therefor—was the very point of the contingency written into the settlement agreement, see note 5, *supra*. Hence the Bank had no reason to assume that the loss of AIBC's assets would necessarily be accompanied by a release of the company's obligation on its guarantee.

In view of the foregoing analysis, there is no need to reach the argument of the Trustee that the New York Bank had actual knowledge of AIBC's insolvency at the time the second payment was made on November 19. This assertion hinges on the testimony of Sheldon Silverston, the president of AIBC, that he met with an officer of the New York Bank on the morning the second loan repayment was due and informed him that AIBC was in serious financial difficulty. The Bank officer, William Boland, testified that he met Silverston for lunch that day but denied that any meeting took place in the morning or that Silverston advised him of AIBC's reverses. Silverston's testimony does not appear sufficiently trustworthy to support a finding of fact in favor of the Trustee on this matter, and no reliance will be placed upon it.[8]

Since the Court finds that the defendant Bank did have reasonable cause to believe that AIBC was insolvent on November 2 and 19, 1973, it is necessary to examine the Bank's contentions that the two loan repayments should not be characterized as preferential transfers.

## III. The Affirmative Defenses of the New York Bank

### A. Set-Off: Both Loans

The Bank asserts that, wholly apart from its status as a secured creditor, its receipt of funds on November 19 constituted a legitimate set-off of the debt owed it by AIBC and was not a transfer subject to recovery by the Trustee as a preference. While the Bank does not make the point, its set-off argument is also applicable to the repayment of the first loan on November 2 and

shall be considered in regard to both loans here.

Section 68 of the Bankruptcy Act, 11 U.S.C. § 108, provides that "[i]n all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor," the debts shall be set off against one another. Such a set-off may not be recovered as a preferential transfer under § 60 by the bankruptcy trustee. *See New York County National Bank v. Massey*, 192 U.S. 138, 147, 24 S.Ct. 199, 48 L.Ed. 380 (1904). Section 68 is applicable where the bankrupt makes a deposit in his bank account in good faith and in the due course of business, and where the deposit is subject to withdrawal at the will of the depositor. *See Joseph F. Hughes & Co. v. Machen*, 164 F.2d 983, 987 (4th Cir. 1947), *cert. denied*, 333 U.S. 881, 68 S.Ct. 912, 92 L.Ed. 1156 (1948).

If the deposit is accepted by the bank with an intent to apply it "on a pre-existing claim against the depositor rather than to hold [it] subject to the depositor's checks in ordinary course," however, the deposit is viewed legally as a transfer in payment of the debt. As such, it may be recovered by the trustee where the elements of a voidable preference are otherwise satisfied. *Goldstein v. Franklin Square National Bank*, 107 F.2d 393, 394 (2d Cir. 1939); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 836 (5th Cir. 1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960); 4 *Collier* ¶ 68.16[2] at 919–920.1.

The deposits to AIBC's account on November 2 and 19 were clearly made and accepted by the New York Bank as payments of AIBC's debts, not as ordinary deposits. Thus, the Bank's internal documents record the credits made to

---

**8.** The other evidence presented on the question is similarly inconclusive. Nikita Lobanov, another Bank officer, wrote a letter on November 21 to a customer to whom he had previously recommended AIBC's services to explain that AIBC was now in financial difficulty. Boland was unable to account for Lobanov's knowledge of AIBC's condition. While the Lobanov letter suggests that the Bank did know of AIBC's problems on or about the date the

second loan was repaid, it is uncontroverted that on November 19 Boland arranged a meeting for Silverston with the Bank officer in charge of Latin American operations to discuss a new transaction AIBC was investigating in the Dominican Republic. This conduct by the defendant Bank seems entirely inconsistent with the proposition that it had actual knowledge of AIBC's insolvency at that time.

AIBC's account and the subsequent debits in favor of the Bank as "Repayment of advance" of May 3 and May 17, 1973, and "re: your [AIBC's] letter 5/15/73."

Since the Bank at no time intended to treat the payments as ordinary deposits into AIBC's account, it may not invoke the sanction of § 68 to protect itself from the Trustee's action under § 60.

### B. Pledge and Assignment: The First Loan

Section 60(a)(2) of the Bankruptcy Act incorporates state law to determine the date on which a transfer is deemed perfected against subsequent lien creditors. See McKenzie v. Irving Trust Co., 323 U.S. 365, 370, 65 S.Ct. 405, 89 L.Ed. 305 (1945). The parties agree that the law of New York should be held applicable to the transactions between the New York Bank and the bankrupt.[9] The question this Court must decide, therefore, is whether AIBC's purported pledge to the New York Bank of its Swiss Franc time deposit, or the alleged assignment of its foreign exchange contract or the time deposit, were valid and enforceable under the law of New York, and if so, when they were perfected.

■■■■ 1. Pledge of the Time Deposit. The Bank's theory that it was the holder of a secured interest in the form of a pledge must fail. While the evidence does demonstrate an intention to pledge to the Bank the Swiss Franc time deposit which AIBC maintained at the Wells Fargo Bank in Luxembourg (hereafter, the "Luxembourg Bank"), no delivery of it or of some evidence of it into the possession and control of the New York Bank ever took place. As is shown below, delivery to the pledgee is essential to the validity of a pledge. Absence of such delivery leaves the debtor in control of the property, and as to other creditors, with the deceptive appearance of complete ownership. The issuance by the Luxembourg Bank to AIBC of a clean receipt for the time deposit, and

9. The Supreme Court has not decided whether the determination of the state law incorporated by § 60(a)(2) of the Bankruptcy Act is to be made in reliance on the choice-of-law rules of the forum state or in accordance with an independent federal choice-of-law rule. McKenzie v. Irving Trust Co., 323 U.S. 365, 371 n.2, 65 S.Ct. 405, 89 L.Ed. 305 (1945). See generally Klaxon Co. v. Stentor Elec. Mfr. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); De Sylva v. Ballentine, 351 U.S. 570, 581, 76 S.Ct. 974, 100 L.Ed. 1415 (1956) (failure to enunciate choice-of-law rule to determine applicable state law incorporated by Copyright Act). As a consequence, the federal courts have adopted a variety of approaches to the problem. Compare Matthews v. James Talcott, Inc., 345 F.2d 374 (7th Cir.), cert. denied, 382 U.S. 837, 86 S.Ct. 84, 15 L.Ed.2d 79 (1965) (law of state where transfer is made), with Hoppe v. Rittenhouse, 279 F.2d 3, 8 (9th Cir. 1960) (law of state of bankrupt's incorporation and execution of contract). See Speare v. Consol. Assets Corp., 367 F.2d 208, 211 (2d Cir. 1966).

Several commentators have argued in favor of an independent federal choice-of-law rule. See, e. g., Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U.Pa.L.Rev. 797, 808 (1957); Note, Applicability of State Conflicts Rules When Issues of State Law Arise in Federal Question Cases, 68 Harv.L.Rev. 1212, 1220–21 (1955) (trustee's action to avoid preference is federally-created right without state analogue, should not be governed by state conflicts rules).

Since the preference provisions of the Bankruptcy Act may work to disrupt, albeit unintentionally, even bona fide transfers, it appears that the Act would be implemented in a manner most consistent with proper commercial practices if the federal court chooses that body of state law which would have governed the transfer between the creditor and the bankrupt had bankruptcy not intervened, insofar as it may be ascertained. Any other rule might require the parties to a transaction to determine, and comply with, two separate sets of rules: those governing the transaction in the event of bankruptcy, and those applying otherwise. Cf. Austrian v. Williams, 198 F.2d 697, 701–02 (2d Cir.), cert. denied, 344 U.S. 909, 73 S.Ct. 328, 97 L.Ed. 701 (1952); Hart, The Relations Between State and Federal Law, 54 Col.L.Rev. 489, 514 (1954).

The Trustee may institute suit for recovery of a preferential transfer in a number of judicial districts. See 3 Collier ¶ 60.60[1.1], at 1105–06. Consequently, the law of the forum state may not always be the one that the parties anticipated would govern their transaction. Thus, the federal courts should not be required to choose the forum state's law in every case; in the instant action, however, it supplies the appropriate rules of decision to assess the transactions between AIBC and the New York Bank.

the failure of the New York Bank to have the receipt recalled or modified to reflect its pledge, are thus fatal to the defendant Bank's pledge claim. Furthermore, even if that were not the case, any pledge which may have existed was lost when the Luxembourg Bank forwarded the deposited funds on November 2 to the Swiss Bank, which had no notice of the New York Bank's interest.

The intention of the New York Bank and AIBC was manifested in an exchange of letters outlining the first loan transaction. Sheldon Silverston, AIBC's president, wrote on April 30, 1973 that the Swiss Franc time deposit "is lodged with you as collateral for the One Million Dollar loan and is subordinated to such loan." The Bank responded in a letter dated May 2 that "You have agreed to lodge with us as collateral the Swiss Franc time deposit. . . ." Finally, the Bank's internal loan authorization form notes the "Time Deposit with WFB/Lux as collateral." [10]

■■■ The defendant Bank contends that the pledge agreement was perfected in that the Luxembourg Bank, with whom the deposit was maintained, had notice of the New York Bank's pledge. The evidence presented to prove that the Luxembourg Bank had such notice is not free from ambiguity. Both the receipt issued to AIBC for the time deposit and the telex sent from Luxembourg to the New York Bank confirming the deposit

make no reference to a pledge. The time deposit was arranged for AIBC by the New York Bank, however, and a telex from Luxembourg to New York dated April 20, 1973 stated that "I assume that this swiss franc deposit placed with Lux will serve as collateral for a dlrs 1 mil loan made by yourselves to your new york customer." The New York Bank claims that it responded to this query by mailing to Luxembourg a carbon copy of the May 2 letter outlining the transaction which has been quoted above in pertinent part. While it would have been more persuasive had the defendant Bank submitted into evidence the actual copy received by its Luxembourg affiliate instead of a copy from defendant's files which was marked with a handwritten blind carbon copy notation, the Court will assume that the copy was sent and as a result that the Luxembourg Bank had notice of an intended pledge to the New York Bank.

The law of New York provides that delivery of pledged property or of an instrument evidencing it to a pledgee or possession of the same by the pledgee is "fundamental" to the validity of the pledge.[11] See McCoy v. American Express Co., 253 N.Y. 477, 482, 171 N.E. 479 (1930). A pledge is also enforceable where such delivery is made to an agent of the pledgee and not the pledgee himself. Id., at 483, 171 N.E. 479. Even if the Luxembourg Bank may be considered the New York Bank's agent,[12]

---

**10.** A document called an "Advance Account Agreement" was also completed in connection with the loan; by executing it AIBC granted a security interest to the Bank "in all *documents* which come into your [the Bank's] possession . . . ." (emphasis added). Since the time deposit was not represented by any document other than the receipt of which AIBC retained possession, the Advance Account Agreement has no bearing on the New York Bank's interest in the Luxembourg deposit.

**11.** Since the Uniform Commercial Code does not apply to any "transfer in whole or in part of . . . any deposit . . . maintained with a bank," N.Y.U.C.C. § 9–104(k) (McKinney 1964), the common law of the state is applicable here.

**12.** The defendant argues that mere notice to a third party is sufficient to perfect a pledge and that an agency relationship is not required between that party and the pledgee. The *Restatement of Security* § 8 (1941) supports the Bank's position, as does the analogous provision in the N.Y.U.C.C. § 9–305 (McKinney 1964). The *McCoy* case required an agency relation where the third party was also an agent of the pledgor. Hence, the case law is unclear whether mere notice may be sufficient for perfection where dual agency is not present. Compare *Cornelius v. C. C. Pictures, Inc.*, 5 F.2d 157 (2d Cir. 1925) (New York law deems mortgagee has possession where bailee has been notified and attorns to mortgagee) *with Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 977 (2d Cir. 1945) (*McCoy* cited for

however, a pledge was not perfected by AIBC's delivery of Swiss Francs to the Luxembourg Bank because the latter bank thereupon issued to AIBC a document acknowledging that AIBC was entitled to the time deposit.

The defendant's analysis ignores the character of the subject matter and what it takes to possess its control; a time deposit is deemed by the common law to be a non-negotiable chose in action. 5 *N.Y. Juris., Banks & Trust Cos.* § 207 (1959). Since the delivery or possession of a chose in action (in essence here, the Luxembourg Bank's obligation to pay AIBC, its depositor and creditor) presents conceptual difficulties, the courts have evolved the doctrine by which ownership of such an intangible may be obtained by possession of a document which represents the chose in action and is deemed indispensable to its control. *See* Annot., 53 A.L.R.2d 1396 (1957). Thus, the New York courts hold a pledge of a savings account is valid where the passbook representing it is delivered to the pledgee. *See, e. g., In re Hoffman's Estate,* 175 Misc. 607, 25 N.Y. S.2d 339 (Sur.Ct.1940).

Neither the New York nor the Luxembourg Bank ever had or maintained possession of an indispensable instrument representing AIBC's Swiss Franc time deposit.[13] Since possession of such a document may be the only means by which a pledge of a time deposit may be perfected, *see Walton v. Piqua State Bank,* 204 Kan. 741, 466 P.2d 316 (1970); *Restatement of Security,* § 1 (1941), the Bank's pledge theory appears unsupportable.

While in this case as distinguished from the facts in other cases, the obligor of the supposedly pledged chose in action, the Luxembourg Bank, had notice of the intended interest of the intended pledgee, the New York Bank,[14] and it may be questioned whether any indispensable instrument was created representing the pledged property, the time deposit, analysis indicates no warrant for

---

proposition that pledgee with possession also holds for second pledgee where he is given notice of second pledge). It may be assumed for purposes of this opinion that the necessary relationship is present.

**13.** The New York Bank contends that it maintained control of the time deposit equivalent to the possession of such an instrument because the time deposit was negotiated by means of the New York Bank's telex facilities, including the use of its "test key" verifying code. The Bank concludes that AIBC could not communicate with the Luxembourg Bank in regard to the time deposit except by using the telex in the control of the New York Bank. The documentary evidence belies this claim, however; the record includes two examples of mail communication from Luxembourg to AIBC, and one—a request for confirmation of the time deposit contract mailed earlier—suggests that an answer by mail was expected. Moreover, the Bank has not established that AIBC could not have obtained the documents or signature cards necessary to obviate the need for the Bank's telex.

The defendant Bank also attempts to circumvent the indispensable instrument requirement by suggesting that the subject of the pledge was the Swiss Francs themselves, not the time deposit. Unless words are not to be taken to mean what they say, however, there is no evidence in the record that AIBC and the New York Bank agreed that the Swiss Francs themselves would be pledged to secure the loan.

**14.** Some support for the view that possession of an indispensable instrument may not be necessary to establish control over a time deposit may be derived by analogy from the theory of *quasi-in-rem* jurisdiction, which is bottomed on a plaintiff's ability to attach a debt by asserting jurisdiction over the person of the party who is indebted to the defendant. *See Harris v. Balk,* 198 U.S. 215, 222, 25 S.Ct. 625, 626, 49 L.Ed. 1023 (1905) ("The obligation of the debtor to pay his debt clings to and accompanies him wherever he goes"). The New York Bank's agency relationship with the Luxembourg Bank, the obligor of the time deposit, may arguably give rise to sufficient control over the obligor to perfect the pledge of the obligation. While this proposition is implicitly rejected in *Walton v. Piqua State Bank, supra* (over a strong dissent), where the pledged time deposit was maintained at the very bank to which it had been pledged, *Walton* is distinguishable in that an indispensable instrument was in existence there, and the pledgee-bank had failed to obtain possession of it. *But cf. Craig v. Gudim,* 488 P.2d 316 (Wyo.1971) (maintenance of deposit at creditor-bank does not give bank "possession" of deposit sufficient to satisfy perfection of assignment under U.C.C.).

a difference in principle here from that in the decided cases. The arrangement employed fails to satisfy the purposes of the delivery requirement of the New York law of pledges even if the indispensable instrument requirement were to be disregarded in this case.

The primary purpose of the requirement that the pledged property be delivered to the pledgee is to provide "notice to the pledgor's creditors . . . that the property in question is no longer free from prior interests of third parties." *Gins v. Mauser Plumbing Supply Co.,* 148 F.2d 974, 977 (2d Cir. 1945). *See In re Merz,* 37 F.2d 1, 4 (2d Cir.), *cert. denied,* 281 U.S. 738, 50 S.Ct. 333, 74 L.Ed. 1152 (1930); *In re Copeland,* 391 F.Supp. 134, 151 (D.Del.1975) (pledgor must not be permitted to derive a "false credit" from apparent ownership of item pledged). The Luxembourg Bank issued a contract directly to AIBC, dated April 30, 1973, which confirmed the time deposit and stated that AIBC would be entitled to 3,305,997.50 Swiss Francs on November 2, 1973.[15] The contract makes no reference to any pledge of the deposit to the New York Bank, and the Bank has not offered any evidence to suggest that the contract was subsequently recalled or modified to reflect a pledge. Hence, the defendant permitted the existence of conditions under which the bankrupt could easily make it appear to potential creditors that the Swiss Franc time deposit was an unencumbered asset. Given the existence of the time deposit receipt in the hands of AIBC and the absence of any effort by the New York Bank to prevent third parties from relying on the apparent ownership of the deposit, the defendant Bank's agency relationship with the Luxembourg Bank where the deposit was maintained is insufficient to constitute that delivery and possession of the property which is necessary to render a pledge valid and enforceable.

Regardless of whether a pledge to the New York Bank of the time deposit had been perfected in Luxembourg's hands, however, the assumed pledge expired when the time deposit matured on November 2. The subject of the pledge—the time deposit—had simply ceased to exist prior to the loan repayment to the New York Bank.

Moreover, without regard to expiration of the time deposit, the assumed pledge was lost as matter of law when the Swiss Francs were forwarded to the Swiss Bank without any notice of a pledge to the New York Bank. The Swiss Francs were then exchanged into dollars which were transmitted to New York by Swiss Bank.

It is clear that a pledge, once perfected, may be lost where the pledgee or his agent has lost possession of the collateral. *McCoy v. American Express Co., supra.* The defendant's own theory posits that a pledge may be perfected where the property is in the possession of a third party only where that party has notice of the pledgee's interest. Yet the defendant Bank has presented no evidence to indicate that the Swiss Bank was aware of the purported pledge.[16] To the contrary, the instructions sent to the Swiss Bank by both AIBC and the Luxembourg Bank show that no reference was made to any interest in the funds by the New York Bank. Thus, whatever validity the pledge may have had while the Luxembourg Bank controlled the property, the pledge ceased to be perfected when the property came into the

---

**15.** There is no contention by either side that this contract constituted an indispensable instrument representing the deposit; it need not be so characterized, however, to have been capable of deceiving creditors of AIBC.

**16.** The New York Bank does contend that the Swiss Bank had notice of the pledge, but its argument is based exclusively on tenuous inferences. Ironically, the defendant suggests that the Swiss Bank must have known of the pledge because it knew of the New York Bank's loan to AIBC, that AIBC was thinly capitalized, and that "it would be incredible for a bank to lend [AIBC] $1,000,000 on an unsecured basis."

control of the Swiss Bank.[17] While the interruption in possession was merely a temporary one, the fact remains that a judgment creditor of AIBC could have foreclosed on the Swiss Francs on November 2 while they were in the custody of the Swiss Bank. Moreover, had AIBC defaulted on its debt to the New York Bank on November 2 by issuing new and different instructions to the Swiss Bank, the defendant would not have had control over any pledged property with which to effect payment of the debt owed it.

■ *2. Assignment of the Time Deposit.* The defendant contends that, irrespective of whether there was a valid pledge of the time deposit, the bankrupt had also assigned the deposit to the Bank. There is no question that time deposits, as choses in action, are assignable. N.Y. Gen'l Oblig.Law § 13–101 (McKinney 1964). *See Myers v. Albany Savings Bank,* 270 App.Div. 466, 60 N.Y. S.2d 477, *aff'd* 296 N.Y. 562, 68 N.E.2d 866 (1946). A finding that the agreement between AIBC and the New York Bank was an assignment would be more advantageous to the defendant than a finding of the existence of a pledge, on two separate grounds: an assignment would not require that the Bank have notified AIBC's obligor of its status as assignee, and an assignment would not need to have been perfected by possession of the underlying obligation.[18]

However, the contention that there was such an assignment is entirely unsupported in the record before the Court.

■ The test for the existence of an assignment is considerably more stringent than that for the existence of an agreement to pledge. While an assignment need not be in writing, 3 *N.Y.Juris., Assignments* § 34 (1958), and need not utilize any particular form or phrase, *see Advance Trading Corp. v. Nydegger & Co.,* 127 N.Y.S.2d 800 (Sup.Ct.1953); *Estate of Palmer,* 53 Misc. 2d 217, 278

---

**17.** The parties initially addressed this issue under the impression that the Swiss Bank processed the currency exchange on November 2 by contemporaneously debiting and crediting AIBC's account at the Swiss Bank, so that the transaction might be deemed to have returned the pledged property to AIBC, the pledgor. The parties appear to have dropped the issue when further factual analysis revealed that AIBC's account was not involved in the transaction on November 2, see note 2, *supra*. The legal significance of the matter is derived more from the loss of possession by the New York Bank than from the identity of the party which obtained the property, however; the Court must therefore deal with the issue.

The defendant Bank points to authority which holds that a pledge may be preserved where the pledgee gives up the property to the pledgor for "a temporary or special purpose." *Hickok v. Cowperthwait,* 210 N.Y. 137, 103 N.E. 1111 (1913). That doctrine is of no avail here since it is based upon an agency relationship between pledgee and pledgor, *See Harrison v. Merchants National Bank,* 124 F.2d 871 (8th Cir. 1942); *Israel v. Woodruff,* 299 F. 454 (2d Cir. 1924), and no showing has been made that the Swiss Bank acted as agent for the defendant.

**18.** While the Uniform Commercial Code imposes the same perfection requirements on assignments and pledges alike, the New York common law, applicable to this alleged assignment of a bank deposit, does not.

As to the notice requirement, the assignee of a time deposit has a "duty" to notify the bank holding the deposit (the obligor) to protect himself against payment by the bank to the assignor. *See Brown v. Empire City Savings Bank,* 23 Misc. 2d 1094, 203 N.Y.S.2d 339 (Sup. Ct.1960). Nevertheless, such notice is not a requirement of a perfected assignment, and it is not a prerequisite for the assignee to be accorded priority against subsequently-attaching creditors of the assignor. *County Nat'l Bank v. Inter-County Farmers Coop. Assoc.,* 65 Misc. 2d 446, 317 N.Y.S.2d 790 (Sup.Ct. 1970).

As to "possession" of the time deposit, a delivery of the property assigned to the assignee is not fundamental to an assignment, though it is to a pledge. *See* 3 *Williston on Contracts* § 430 at 172 (3d ed. 1960). *See generally* 3 *N.Y.Juris., Assign.* § 36 (1958). Thus the issue of the indispensable instrument doctrine appears irrelevant to the assignment asserted here. This result may be anomalous, for potential creditors of the assignor may be as deceived by an unrecorded or unpossessed assignment as by an undelivered pledge. The New York common law does not require either notice or filing of an assignment, however, and does not appear sensitive to the policy of protecting potential creditors in the assignment context.

N.Y.S.2d 352 (Sur.Ct.1967) (substance, not form of transaction controls), it must have divested the assignor of all right, control and interest in the property assigned, and transferred the same entirely to the assignee. *Advance Trading, supra*; *Smith v. New York*, 74 Misc. 2d 723, 344 N.Y.S.2d 799, 801 (Sup.Ct.1973).

The New York Bank contends that the proper test for the existence of an assignment is whether the obligor (the party indebted to the assignor) would be justified in paying its debt to the person claiming to be the assignee. *See Hinkle Iron Co. v. Kohn*, 229 N.Y. 179, 128 N.E. 113 (1920); *Fairbanks v. Sargent*, 117 N.Y. 320, 22 N.E. 1039 (1889); *Donovan v. Middlebrook*, 95 App.Div. 365, 88 N.Y.S. 607 (1904); *Modern Kitchens, Inc. v. Damiano*, 51 Misc. 2d 264, 273 N.Y.S.2d 151 (Sup.Ct.1966).

Despite support for this contention in the case law cited, the defendant's formulation provides little assistance to the determination of whether a specific transaction should be deemed an assignment. It is both circular—an assignment may exist if the obligor is justified in paying the assignee, but the obligor may not be justified in paying unless there exists an assignment—and insufficiently discriminating. *See 3 Williston on Contracts* § 428 at 161–62 (3d ed. 1960) (the test posed by *Donovan v. Middlebrook* is incomplete). Hence, the analysis of whether in the instant case the acts and transactions of the parties gave rise to valid assignments requires a more detailed examination of the applicable law.

Preliminarily, it is clear that an agreement between two parties in which the first agrees to pay the amount he owes to the second out of a specific fund does not constitute an assignment of that fund. *Williams v. Ingersoll*, 89 N.Y. 508 (1882); *Donovan v. Middlebrook, supra*; *Modern Kitchens, Inc. v. Damiano, supra*. The theory underlying this principle is that the debtor continues in control of the fund until payment is actually made, and the retention of control over the subject matter is inconsist-

ent with an assignment of it. *See Donovan, supra*, 95 App.Div., at 367, 88 N.Y.S. 607.

It is equally clear that an instruction by one party to his obligor to pay a second party does not constitute an assignment of that obligation. Such an instruction is a "mere direction, revocable [by the first party] at will." *Schreiber v. Keller Mechanical Engraving Co.*, 57 Misc. 644, 108 N.Y.S. 658 (Sup.Ct.1908). *See Aetna National Bank v. Fourth National Bank*, 46 N.Y. 82, 92 (1871) ("an agreement, upon no new consideration, between debtor and creditor, that the former should pay the amount of his debt to a third person, is not irrevocable by the creditor").

Since an assignment requires a complete divestiture of control, the retained power to revoke precludes the creation of an assignment. *See Maloney v. John Hancock Mutual Life Insurance Co.*, 271 F.2d 609, 614 (2d Cir. 1959) (under New York law, valid assignment requires "such a present transfer of title or dominion that the debtor can safely pay the fund to the assignee notwithstanding any protests or orders to the contrary by the assignor"); *Farmers' Loan & Trust Co. v. Winthrop*, 207 App. Div. 356, 362, 202 N.Y.S. 456, 462 (1923), *modified*, 238 N.Y. 477, 144 N.E. 686 (1924), *cert. denied*, 266 U.S. 633, 45 S.Ct. 225, 69 L.Ed. 479 (1925) ("an equitable assignment does not exist where an assignor retains . . . any power to revoke"); *In re Knowlton*, 208 Misc. 454, 464, 143 N.Y.S.2d 111 (Sur.Ct.1955).

It is nonetheless true, however, that an instruction to an obligor will constitute an assignment if such an instruction is accompanied by some further manifestation of an intention to assign. *Restatement (Second) of Contracts*, [Tent. Drafts 1–7] § 157(1), comment a. Thus, where the first party writes a letter to his obligor, ordering him to pay a second party, and the letter (or notice of it) is given to the second party, a valid assignment of the obligation has taken

place. It is essential that the order to the obligor direct payment of a specific obligation owed to the first party, and not rely on the general credit of the first party, however.[19]

 While an order directed solely to an obligor does not satisfy the requirement for an assignment of an agreement between assignor and assignee, see *Associated Metals & Minerals Corp. v. Isletmeleri,* 6 Ill.App.2d 548, 128 N.E.2d 595, 598 (1955), notice or delivery of the order to the assignee is sufficient to signify the requisite agreement, and the order to the obligor presumably makes of that agreement something more than a mere designation of a fund out of which payment is to be made.[20]

 In sum, an assignment requires an agreement whereby the assignor agrees to transfer presently all right, title and control over the subject matter of the assignment to the assignee. Such an agreement may be manifested by conduct, writing or parol, and in particular it exists where the assignor instructs his obligor to pay the specific fund owing to him to the assignee, and the assignor either delivers that order to the assignee or notifies him of it. No agreement to assign is created, however, by either (1) an agreement between two parties that the first will pay a debt owing to the second out of a specific fund; or (2) a revocable instruction to the obligor to pay the obligation to the would-be assignee.

**19.** See *Fischer v. Liberty Nat'l Bank & Trust Co.,* 53 F.2d 856 (S.D.N.Y.1931), *aff'd,* 61 F.2d 757 (2d Cir. 1932), *cert. denied,* 288 U.S. 611, 53 S.Ct. 403, 77 L.Ed. 985 (1933); *United States v. Bush Construction Co.,* 176 F.Supp. 524, 526 (E.D.N.Y.1959) (delivery by nonparty to plaintiff of letter addressed to defendant authorizing it to pay funds due non-party to plaintiff constitutes irrevocable assignment); *Doyle v. East New York Savings Bank,* 44 N.Y.S.2d 318 (Mun.Ct.), *aff'd,* 44 N.Y.S.2d 328 (Sup.Ct.1943) (citing *Brill v. Tuttle*); *Brill v. Tuttle,* 81 N.Y. 454 (1880) ("when . . . an order is drawn upon a third party and made payable out of a particular fund, then due or to become due from him to the drawer, the delivery of the order to the payee operates as an assignment *pro tanto* of the fund"); *Lauer v. Dunn,* 115 N.Y. 405, 22 N.E. 270 (1889) (same); *Seamon v. Federated Films, Inc.,* 142 N.Y.S.2d 324, 332 (City Ct.1955) (assignment in form of an irrevocable direction to pay is valid); *A. O. Andersen & Co. v. Lamborn,* 112 Misc. 235, 184 N.Y.S. 88 (Sup.Ct. 1920); *Associated Metals & Minerals Corp. v. Isletmeleri,* 6 Ill.App.2d 548, 128 N.E.2d 595 (1955); *Edmund Wright Ginsberg Corp. v. C. D. Kepner Leather Co.,* 317 Mass. 581, 59 N.E.2d 253 (1945); 3 *Williston on Contracts* § 426 (3d ed. 1960) ("An order by the creditor given directly to the debtor requesting him to pay a third person does not in the absence of notice to that person make him an assignee of the claim"); *Restatement (Second) of Contracts, supra,* § 157(1).

**20.** While some of the authority cited in note 19, *supra,* suggests that the delivery of an order gives rise to an "equitable" assignment, the distinction between legal and equitable assignments would appear inapplicable to the particular transactions before the Court. The defendant's assignment arguments involve alleged assignments to it of (1) AIBC's time deposits of Swiss Francs, and (2) AIBC's right under its foreign exchange contracts with the Swiss Bank to receive dollars on November 2 and 19. Both time deposits, as choses in action, and contract rights may be assigned legally, not merely equitably. This is the case even if the deposit or contract right is to mature or be performed subsequent to the date of the assignment. See *Stathos v. Murphy,* 26 App.Div.2d 500, 276 N.Y.S.2d 727 (1966), *aff'd,* 19 N.Y.2d 883, 281 N.Y.S.2d 81 (1967) (assignment of present claim which has not yet matured is nonetheless an assignment of a present interest); *Rockmore v. Lehman,* 129 F.2d 892 (2d Cir. 1942), *cert. denied,* 317 U.S. 700, 63 S.Ct. 525, 87 L.Ed. 559 (1943), *rev'g on rehearing,* 128 F.2d 564 (2d Cir. 1942) (an assignment by one party to an existing bilateral contract of his right to the other party's performance constitutes a present transfer and is therefore enforceable at law, even where the contract is completely executory when assigned).

Although an equitable assignment does not take effect until the assigned funds actually come into existence, a legal assignment is perfected when made (absent statutory requirements, such as filing). Since the assignments asserted by the Bank constitute present transfers, if they exist at all, the timing of perfection of equitable assignments is irrelevant to the issues at hand. The trustee's citation of *PPG Industries, Inc. v. Hartford Fire Insurance Co.,* 384 F.Supp. 91, 95 (S.D.N.Y.1974) is also inapposite, since that case involved the equitable assignment of a future interest in the proceeds of a claim.

Applying these principles of law, it is clear that the evidence in the record does not reflect any assignment by AIBC of its Swiss Franc time deposit to the New York Bank. Neither the letters exchanged between AIBC and the defendant on April 30 and May 2, 1973, nor the Advance Account Agreement signed by AIBC, purports to divest the bankrupt of all right, title and control of the time deposit. At most those documents grant a security interest in the deposit to the New York Bank while leaving title in AIBC.[21]

Furthermore, the instructions AIBC issued to the Luxembourg Bank (by means of a telex from the New York Bank sent at AIBC's request) cannot constitute an assignment of the time deposit to the defendant as an order drawn on the assignor's obligor, for they directed Luxembourg to pay the Swiss Bank at maturity, not the New York Bank. The Swiss Bank in turn was instructed to forward the dollars to the New York Bank for AIBC's account there.[22] This sequence of revocable instructions may be taken at most to designate the fund out of which AIBC planned to repay the New York Bank, but such a designation does not constitute an assignment of the fund. *See Donovan v. Middlebrook, supra.*

A thorough discussion of the New York Bank's defense requires that the Court consider the "General Pledge Agreement" which AIBC entered into with the Bank on January 29, 1970, long before the transactions giving rise to the instant litigation. While the defendant does not advert to the 1970 Agreement in connection with its time deposit assignment theory, it appears relevant since in executing it AIBC agreed to "assign, transfer to and pledge with [the New York Bank] . . . all money and property . . . which shall hereafter be delivered to or come into the possession, custody or control of Bank in any manner. . . ." Nonetheless, even if the Luxembourg Bank's possession of the Swiss Francs is deemed to satisfy the custody requirements of the 1970 Agreement, the resulting assignment automatically terminated when that Bank lost "possession, custody or control" over the funds by transferring them to the Swiss Bank, which had no notice of the defendant's interest.

Finally, the actual conduct of the defendant is inconsistent with the assignment theory it presses here. When the funds were transmitted to it from the Swiss Bank on November 2, the New York Bank credited AIBC's account with the full amount received, and then debited it with the principal and interest due on the May loan. Had there been an assignment of those funds to the Bank, it presumably would have taken the payment directly for itself and credited AIBC's account only with the excess received above the amount assigned to the Bank.

*3. Assignment of the Foreign Exchange Contract.* In connection with the loan from defendant, AIBC entered into a foreign exchange contract with the Swiss Bank by which AIBC was to sell that bank Swiss Francs on November 2, 1973 and receive dollars in return. Wholly apart from its claims in regard to the Luxembourg time deposit, the New York Bank contends that AIBC assigned to the Bank this contract right

**21.** The Bank puts forward the proposition that an agreement to pledge a chose in action automatically constitutes an assignment thereof. There is no foundation for such a view—no assignment may be enforced unless it satisfies the requisite legal criteria.

**22.** The New York Bank instructed the Luxembourg Bank at AIBC's request on May 1, 1973

to pay the time deposit at maturity to the Swiss Bank which then should "credit dollar equivalent 1,042,814.37 to WFBI [the New York Bank] for account American I.B.C." On November 2, 1973, the Luxembourg Bank instructed the Swiss Bank to "remit dollar equivalent to Wells Fargo Bank Int. New York . . . in favour of American IBC Corp."

to receive dollars from the Swiss Bank.[23] As evidence of this purported assignment, the defendant points to certain conclusory trial testimony by the Bank's officers, and to the letter of April 30 sent by AIBC to the Bank outlining the first loan transaction. That document states in relevant part

> We have instructed Swiss Credit Bank to deliver to Wells Fargo Bank International Corp. New York, value November 2, 1973, the sum of US $1,042,-814.37.

This statement would appear to notify the New York Bank that AIBC had instructed its obligor, the Swiss Bank, to deliver the money due AIBC to the New York Bank. As such, it satisfies one of the elements of an assignment. However, the actual instruction given the Swiss Bank was not sufficient to constitute an assignment in favor of the defendant, for it specified that the funds were not to be paid to the New York Bank, but to AIBC's account there.[24] Hence, there was no order by one party directing its obligor to pay a second party for the latter's own use; see Brill v. Tuttle, supra. Since there is absolutely no other evidence of an intention by AIBC to divest all its right, title and control over the contract right in favor of the New York Bank, the Bank's contract right assignment theory may not prevail.

Even if the record before the Court had established an assignment of AIBC's contract right to the New York Bank, the defendant's failure to comply with the filing provisions of the New York Uniform Commercial Code governing contract assignments would have rendered the alleged assignment invalid as against the Trustee. The Code is inapplicable to security interests in bank accounts, § 9–104(k), and consequently, would not have applied to a pledge or assignment of the Luxembourg time deposit, if one had been made. However, the Code does govern and applies to assignments of contract rights, §§ 9–102(1)(a), (2).[25]

The April 30 letter allegedly establishing the contract right assignment does not measure up to a security agreement under the U.C.C. since it fails to contain a "description of the collateral" as required by § 9–203(1)(a). Cf. In re Laminated Veneers Co., 471 F.2d 1124, 1125 (2d Cir. 1973). Moreover, the Bank failed to file a financing statement, as required by §§ 9–303, 302(1). Hence, under the Code, the defendant failed to

---

**23.** The assignment of a contract right which is to become due in the future nevertheless constitutes a present transfer and is enforceable at law. See note 20, supra.

**24.** AIBC telexed the Swiss Bank on April 30, 1973 that on November 2 it should "Kindly arrange delivery of counter-value dlrs 1,042,-814.37 to Wells Fargo Bank International Corp. New York value November 2, 1973 reference American IBC Corp." Whatever ambiguity may inhere in the phrase "reference" is resolved by AIBC's use of the same term elsewhere in the telex in a context in which the phrase could only mean "for the account of." Also see note 22, supra.

**25.** The defendant argues that the U.C.C. is inapplicable to the assignment because (1) it was itself repayment of AIBC's debt to the New York Bank, not merely security for such repayment; and (2) it falls within the Code's exception under § 9–104(f) for transfers which delegate contract duties as well as assign rights. The defendant's contention may be correct that assignments which are meant to effect payment in themselves and not merely to provide security are not controlled by the U.C.C., see § 1–201(37); Art-Camera-Pix, Inc. v. Cinecom Corp., 64 Misc. 2d 764, 766, 315 N.Y.S.2d 991 (Sup.Ct.1970). But see J. White & R. Summers, Handbook of the UCC (1972) § 22–8 at 778. Nevertheless, there is no evidence to show that the assignment alleged here was so intended. To the contrary, it stretches credibility to assert that AIBC's debt to the New York Bank on the first loan was extinguished on May 3 by virtue of the contract right assignment; had the defendant not received repayment on November 2, it seems at least as likely that it would have sought payment from AIBC on its promissory note as from the Swiss Bank on the assignment.

The Bank's second contention is similarly devoid of merit. There is nothing in the record to suggest that AIBC delegated to the New York Bank its obligation to perform under the contract by supplying Swiss Francs to the Swiss Bank.

obtain a valid and perfected assignment of contract rights.

■■■ The defendant Bank maintains that it was not required to file a financing statement because its assignment fell within the terms of § 9–302(1)(e), which exempts from filing

> an assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor.

The Bank had the burden to prove that the exemption of § 9–302(1)(e) was available to it, however, *Craig v. Gudim,* 488 P.2d 316, 320 (Wyo.1971); 3 *Collier* ¶ 60.-51A, at 1050.10, and it failed to do so. On the record before the Court, AIBC's total "outstanding accounts or contract rights" at the time the instant assignment was allegedly made were $4,439,-300.[26] The assignment thus transferred just under 20% of the bankrupt's accounts, including the assigned contract right. That would appear to be a "significant part" of its outstanding accounts, especially in view of the high absolute value of the transaction at issue. *See* 1 P. Coogan, W. Hogan & D. Vagts, *Secured Transactions* § 10.03[8] at 1087 (rev. ed. 1974) (this filing exemption "is surely not calculated to excuse from compliance with the notice-filing requirement an assignment to a bank of a single large claim simply because it is an isolated assignment"); J. White & R. Summers, *Handbook of the UCC,* § 23–8 at 808–09 (1972) (certainty renders percentage test preferable to criterion relying on isolatedness of transaction). *But see Standard Lumber Co. v. Chamber Frames, Inc.,* 317 F.Supp. 837, 840 (E.D. Ark.1970) (assigned accounts totalling some $3,000 or 16% of outstanding accounts, held not significant part).

Thus, none of the New York Bank's theories establish that the Bank enjoyed any security at all in respect of the first loan with which to insure repayment thereof.

### C. Pledge and Assignment: The Second Loan

The second loan extended to AIBC by the New York Bank, and the underlying currency arbitrage transaction between AIBC and the Swiss Bank, followed the same pattern as the first loan transaction. Instead of opening a second six-month Swiss Franc time deposit with the Luxembourg Bank, however, AIBC placed the deposit account with the United California Bank in London (hereafter, the "London Bank"). Furthermore, the text of the documents reflecting the May 17 loan agreement between the bankrupt and the New York Bank differed from that of the May 3 loan, and is even less suggestive that the transaction was secured. Consequently, while the defendant's arguments that the time deposit and the foreign exchange contract right were pledged or assigned to it may be ingenious, they remain unpersuasive.

■■■ *1. Pledge of the Time Deposit.* The Bank's pledge theory is defective, for the evidence in the record reflects neither an intention by AIBC to

---

**26.** The defendant submitted a figure of some $8.8 million. In arriving at that figure it relied on $3.3 million of foreign exchange contracts AIBC had entered into with the Swiss Bank other than those which involved loans from the New York Bank. The Swiss Bank's statement of AIBC's account with it for the period January 1 through December 4, 1973, which was introduced into evidence, shows the transactions were posted in August 1973. While the contract rights giving rise to the recorded exchanges may have been outstanding in the spring of 1973, the defendant has presented no evidence to that effect and this Court can make no assumptions. The other element in the Bank's calculations involved $5,586,400 for foreign exchange contracts AIBC had entered into with the National Bank of North America; AIBC breached those contracts in July and August 1973, and the figure relied upon by the Bank was the amount AIBC agreed to pay NBNA in settlement. The actual total of contract rights outstanding with NBNA after February 9, 1973, exclusive of the loss NBNA incurred as a result of AIBC's breach in the summer of 1973, was the $4,439,300 discussed above.

pledge its Swiss Franc deposit to the New York Bank nor a delivery of the deposit or any document representing it into that Bank's possession.

The document which records the agreement between AIBC and the defendant in regard to the second loan is a letter from the bankrupt to the Bank dated May 15, 1973. Unlike the exchange of letters which gave rise to the first loan, the May 15 letter made no reference to any collateral, nor to any agreement to "lodge" the time deposit with the New York Bank. Instead, it merely outlined the arbitrage transaction for which the borrowed funds were to be employed, and indicated that AIBC had issued instructions to the London Bank and the Swiss Bank which would result in repayment to the New York Bank of the money due on November 19. There was no suggestion that such instructions were irrevocable.

The defendant's internal offering sheet for the second loan also varies from that for the first, since it refers to no collateral and recites merely the existence of the May 15 letter and a promissory note which had not yet been sent.[27] Indeed, the Bank did not obtain a signed promissory note or an advance account agreement prior to forwarding the second million dollars, and apparently did not solicit such documents until months later, on August 3, 1973. Notwithstanding a request to AIBC on that date from the Bank, it appears that no promissory note or advance account agreement was ever executed by AIBC in connection with the second loan. Finally, there is no evidence apart from the written documents to suggest that AIBC and the defendant had agreed orally to secure the loan with a pledge of the London Bank time deposit.

■■■ As to the delivery and possession of the time deposit by the New York Bank which is essential to a perfected pledge, the Bank puts forward a rather complicated theory. It does not maintain that the London Bank had notice of its "pledge" or acted as its agent; instead, it contends that the Swiss Bank had constructive possession of the time deposit by virtue of an irrevocable instruction which AIBC gave to the London Bank on July 16, 1973 to forward the Swiss Francs at maturity to the Swiss Bank. The defendant then argues that the Swiss Bank's possession was sufficient to perfect a pledge in favor of the New York Bank on either of two grounds: (1) the Swiss Bank had notice of the "pledge"; or (2) the Swiss Bank was itself a pledgee of the time deposit, and possession by that pledgee operated to perfect a second pledge to the defendant, even where the first pledgee had no notice of the second.

The Bank's theory must fail even if one accepts the validity of each of its elements. The Swiss Bank's "constructive possession" of the time deposit was inadequate to perfect any pledge of that property, whether to the Swiss Bank or the New York Bank, for neither bank took steps to prevent AIBC from being able to represent its London Bank deposit as an unencumbered asset. To the contrary, the London Bank issued a confirmation of the deposit to the bankrupt, dated May 16, 1973, which nowhere reflected any interest of either bank. As discussed in connection with the first loan, possession of an indispensable instrument representing the time deposit is a prerequisite to the perfection of a pledge of the deposit, at least where such possession is necessary to disable a pledgor from deriving a false credit from apparent ownership of the pledged property.

■■■ In any event, there is no evidence in the record which suggests that

---

27. An internal report of the New York Bank dated October 19, 1973, outlining both loans, does refer to the London Bank time deposit as collateral for the second loan, but it is not evidence of an agreement with AIBC. Nor is the reference to a pledge of the London Bank deposit in AIBC's own account book dispositive; testimony at trial indicated that the bankrupt's books did not necessarily present either an accurate or contemporaneous record of the transaction.

the Swiss Bank had notice of the alleged pledge by AIBC of the London Bank deposit to the defendant.[28] Contrary to the New York Bank's argument, such notice is essential to the perfection of a pledge even where the property is in the possession of a prior pledgee. In *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 977–78 (2d Cir. 1945), the Second Circuit held that property which has been delivered into the possession of one pledgee may be pledged a second time without delivery to the second pledgee. In deciding that a pledge agreement alone, without delivery, was sufficient to create a valid pledge where the property at issue was already held by a prior pledgee, the Court of Appeals added that "[t]he only additional requirement suggested is that the first pledgee be given notice of such contract. . . ." While that language is more precatory than mandatory, sufficient notice was provided in the case before the appeals court. Any contrary rule would fail to effectuate the primary purpose of the delivery requirement for a valid pledge, for potential creditors, upon inquiry to the first pledgee, would not learn of the interests of other parties in the property. *See Robinson v. Exchange National Bank*, 31 F.Supp. 350, 351 (N.D.Okl.1940) (possession by one pledgee perfects interest of second where there is agency relationship between the two parties); *In re Chapman*, 5 UCC Rep.Serv. 649, 652 (W.D.Mich.1968) (possession by one secured party under UCC § 9–304(1) also perfects for second since inquiring creditors will learn of all interests in the property).

Consequently, there is no basis for concluding that the New York Bank ever acquired a valid, perfected pledge of AIBC's time deposit at the London Bank.

*2. Assignment of the Time Deposit.* There is no evidence to support the defendant's contention that AIBC assigned the London Bank time deposit to it. To the contrary, all the facts are entirely inconsistent with the notion that AIBC transferred all right, title and interest in the deposit to the New York Bank.

AIBC instructed the London Bank on May 15, 1973 to pay the value of the time deposit at maturity to the Swiss Bank "in favor of American IBC Corp." Although the New York Bank received a carbon copy of that instruction, the document nowhere directs the London Bank to pay the New York Bank. On July 16, 1973, AIBC mailed "irrevocable instructions" to the London Bank to pay both principal and interest at maturity to the Swiss Bank. No reference appeared to the New York Bank.

While AIBC's irrevocable instruction may have transferred control of the time deposit to the Swiss Bank, it is clear that until that event AIBC retained complete control over the time deposit. After the instruction was issued, no possibility remained that the time deposit might be assigned to the New York Bank by AIBC.

*3. Assignment of the Foreign Exchange Contract.* The Bank asserts that AIBC's letter of May 15, 1973 to the Bank created an assignment to the Bank of AIBC's right to receive dollars under its second foreign exchange contract with the Swiss Bank. That document does lend some support to the Bank's position, for in it AIBC notified the New York Bank that it had

---

**28.** The Bank argues that such notification may be found "by implication from the surrounding circumstances." It argues that the Swiss Bank's insistence that AIBC make irrevocable its instructions to the London Bank to forward the funds to the Swiss Bank when the time deposit terminated may be understood only if the Swiss Bank was acting on the New York Bank's behalf. It also maintains that the Swiss Bank knew that this second transaction was similar to the first, which involved a pledge; that the Swiss Bank knew the defendant must have had security for its loan; and that the Swiss Bank was aware that the funds had come from the New York Bank, were to return to it, and that the defendant had been given a copy of AIBC's May instructions to the London Bank. These conclusory and conveniently speculative inferences are clearly insufficient to meet the defendant's burden of proof on the issue.

instructed Swiss Credit Bank, Zurich to pay Wells Fargo Bank International Corp. New York the sum of $1,046,-894.05 value November 19th, 1973.

As discussed in regard to the first loan transaction, a debt due or payable to the assignor may be assigned by a direction to the debtor to pay the debt to a designee for the latter's own use providing that notice of the direction has been given to the designee by the assignor. To come within this rule it was requisite for AIBC to direct Swiss Bank to pay the New York Bank and for AIBC to notify the New York Bank of the direction. The May 15th letter appears to satisfy such a notice requirement.

The actual instruction AIBC gave to the Swiss Bank, however, belies the existence of an assignment. In its telex of May 15 to the Swiss Bank, its debtor, AIBC wrote

> kindly deliver the countervalue in u. s. funds (1,046,894.05 dollars) to wells fargo bank inter'l corp. *in favor of american ibc corp* value november 19, 1973 (emphasis added).

It thus appears that the bankrupt merely instructed the Swiss Bank to forward the dollars to its own account at the New York Bank, not to pay the New York Bank. Consequently, AIBC did not divest itself of control over the dollars and transfer all right and interest in them to the defendant by virtue of either the telex or letter of May 15; it made no assignment.

Moreover, as with the first loan, the subsequent conduct of the defendant is inconsistent with an assignment to it of the foreign exchange contract right. Had there been an assignment, the New York Bank would not have credited AIBC's account with the entire sum that it received on November 19; instead, it would have taken the amount assigned to it directly, and credited any excess to AIBC's account.

 Finally, as with the first loan, any assignment of the second foreign exchange contract would have been governed by the New York Uniform Commercial Code.[29] The New York Bank's failure to obtain a written security agreement describing the collateral, and to file a financing statement putting other creditors on notice of the assignment, thus would deprive it of a valid and perfected interest enforceable against the trustee even if it had been able to establish that an assignment otherwise existed.

Thus, as was the case with the first loan, none of the New York Bank's theories justifies a conclusion that the second loan was in any way secured, or that the transfer which extinguished it occurred, under § 60(a)(2) of the Bankruptcy Act, at any time other than November 19, 1973.

### D. Payment of the Bankrupt's Debt by the Swiss Bank: The Second Loan

In outlining the second loan transaction to the New York Bank, AIBC explained in its letter of May 15 that it had instructed the Swiss Bank to for-

---

**29.** In addition to the arguments it made in regard to the UCC's applicability to the contract right assignment in the first loan transaction, *see* note 25, *supra*, the defendant maintains that the assignment of the second foreign exchange contract did not involve a "contract right" as that term is defined in § 9–106. Such a right under the Code is a right to payment "not yet earned by performance". The Bank submits that the irrevocable instruction AIBC issued to the London Bank to forward the Swiss Francs to the Swiss Bank constituted AIBC's performance under its exchange contract with the Swiss Bank, so that the right to the dollars it assigned to the defendant had already been earned. Even if that is a proper analysis, however, the UCC remains applica-

ble. A "contract right" which has been earned by performance constitutes an "account," § 9–106, Official Comment (McKinney 1964), and an assignment of an account is governed by the Code in the same fashion as that of a contract right.

As to the applicability of the UCC's exemption from filing for assignments of insignificant portions of a debtor's outstanding accounts, the assignment of the second foreign exchange contract, in conjunction with the first, gave rise to an assignment to the New York Bank of approximately 32% of AIBC's outstanding contract rights and accounts as of May 1973, on the record before the Court. *See* note 26, *supra*.

ward to the New York Bank the dollars to come due on November 19 under the foreign exchange contract. In August, however, AIBC changed its instructions to the Swiss Bank without informing the New York Bank. AIBC at the time was indebted to the Swiss Bank as a result of transactions wholly unrelated to those at issue in this litigation, and on August 29 AIBC instructed the Swiss Bank to retain the dollars due AIBC for itself (Swiss Bank) and thereby extinguish AIBC's debt to it.[30] Thus, the funds which AIBC had designated for repayment of the second loan made by the New York Bank were no longer to be available for that purpose. However, the new instructions to Swiss Bank were not followed.

On November 19 the Swiss Bank, through error, forwarded the dollars to AIBC's account at the New York Bank pursuant to the original instructions from AIBC of May 15. The Swiss Bank soon discovered its mistake, and requested a return of the funds from the New York Bank in a series of telexes in early December 1973. The defendant denied that the Swiss Bank had any right to reclaim the dollars, and refused to give them up.[31]

The New York Bank has now seemingly changed its position, and in an attempt to turn AIBC's apparent double-dealing to its advantage, contends in this Court that the dollars it received on November 19 had been assigned to the Swiss Bank, and therefore that the deliv-

ery of the dollars was not a transfer to the New York Bank of the property of the bankrupt. The defendant maintains that the transfer of funds from the Swiss Bank to it merely substituted the Swiss Bank for the New York Bank as a claimant in bankruptcy, and thus had no effect on other creditors. *See In re Erie Forge & Steel Corp.*, 456 F.2d 801 (3d Cir. 1972). Since a transaction is preferential only if it transfers the bankrupt's property, the defendant would be immune from the trustee's attack if its contention is correct that the funds it received belonged not to AIBC but to the Swiss Bank. Bankruptcy Act, § 60(a); *see Ricotta v. Burns Coal & Building Supply Co.*, 264 F.2d 749 (2d Cir. 1959) (essence of a preference is depletion of bankrupt's estate available to remaining creditors); *La Bour v. Allen*, 165 F.Supp. 471, 474 (W.D.Mich.1958).

 The defendant's contention raises the threshold question of the choice-of-law to be applied to determine whether AIBC's telex of August 29 to the Swiss Bank constituted an assignment of the foreign exchange contract right to that bank. Since an independent federal choice-of-law rule is appropriate,[32] New York's rules are not controlling. Similarly, neither the parties' agreement that New York's substantive law applies to the transactions between AIBC and the New York Bank, nor their initial assumption that New York law is applicable here, is dispositive since this alleged assignment involved AIBC and

---

**30.** AIBC's telex of August 29 to the Swiss Bank reads in pertinent part:

2) ucb [the London Bank] nov 19 paying you 3,182,557.83 Swiss francs representing 3,130,000 principal and 52,557.83 interest.

3) this sum of 3,182,557.83 sf sold you value 19 nov 1973 per our conversation with mr ribi and second telex of may 15 to mr ribi attn: at rate of 3.04 meaning for dlrs 1,046,894.05.

4) kindly utilize these dollars to repay all dollar advances (and interest thereon) made to american ibc corp.

**31.** The New York Bank telexed the Swiss Bank on December 11, 1973 that:

these funds were pledged to our bank to secure a loan and upon their receipt were applied to the repayment of that loan. We are of course shocked to hear from you that these same funds were pledged to you and that you feel they were transmitted to us in error. Obviously from our point of view and based on loan documents and pledge agreement in our files the receipt of these funds constituted the final phase of the orderly liquidation of a secured transaction. You will understand that we cannot return these funds.

**32.** *See* note 9, *supra.*

the Swiss Bank, and the latter is not a party to this action.

An examination of the contacts which the August 29 transaction had with Switzerland and New York, the two jurisdictions whose law is potentially applicable, indicates that Switzerland's interest is the more substantial. While the transaction itself took the form of an international telex, the contract allegedly assigned was to be performed in Switzerland by a Swiss entity, and the assignee was also Swiss; the only contact with New York was the residence of the assignor. Consequently, Swiss law seems appropriate.[33] Cf. In re Circle Trading Corp., 26 F.2d 193 (2d Cir. 1928) (Argentine law determines validity of security interest for preference purposes).

In responding to the Court's post-trial request that the parties brief the assignment issue under Swiss law, the defendant submitted evidence that AIBC had entered into an agreement with the Swiss Bank which provided that all transactions between them would be governed by Swiss law. While this agreement was not introduced in evidence at trial, it appears reliable, and together with the New York Bank's revised conclusion that Swiss law is indeed applicable, reinforces the Court's decision.

 It appears that AIBC's August 29 telex to the Swiss Bank does not constitute an assignment under Swiss law, as presented to the Court by the parties.[34] Accordingly, the New York Bank's argument that the funds it received on November 19 belonged to the Swiss Bank may not be sustained.

The expert opinion of Swiss counsel provided by the defendant declares that the Swiss Bank was entitled both to a lien and a right of set-off on the dollar proceeds of AIBC's foreign exchange contract, and concludes that no third party could have obtained an interest in those dollars superior to that of the Swiss Bank after August 29, 1973. The Swiss Bank's priority as against other creditors of AIBC is not at issue, however; that the Swiss Bank may have had a lien on the funds it forwarded to New York does not mean that those funds ceased to be the property of AIBC.[35] Only an assignment or other transfer of all right, title and interest in the funds to the Swiss Bank could have worked the change in ownership which is crucial to the defendant's theory.

---

**33.** It is likely that the New York courts would also apply Swiss law to determine if the telex constituted an assignment, especially in light of the agreement regarding the applicable law by the parties to the assignment. See Haag v. Barnes, 9 N.Y.2d 554, 216 N.Y.S.2d 65, 175 N.E.2d 441 (1961); Levey v. Saphier, 370 N.Y. S.2d 808, 813 (Sup.Ct.1975).

It is true, as the Trustee argues, that the choice-of-law provisions of the New York Uniform Commercial Code appear to make Article 9 of the Code applicable to determine the "validity and perfection of a security interest" arising from an assignment of a contract right where the assignor's record-keeping office is in New York, §§ 9–103(1), 1–105(2) (McKinney 1964). The issue of whether the August 29 telex is an assignment at all, however, is an independent question for which the Code supplies no rule of decision. Hence the New York courts would need to apply some body of law other than the U.C.C. to determine the character of the August 29 telex, and, as shown above, it appears likely that the law applied

would be that of Switzerland, not the common law of New York.

It should be noted that the U.C.C.'s choice-of-law rules may be subject to the limitations which are imposed on the applicability of American domestic law to essentially foreign transactions. See generally Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir.), cert. denied, —— U.S. ——, 96 S.Ct. 453, 46 L.Ed.2d 389 (Dec. 8, 1975); Leasco Data Processing Equipt. Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972).

**34.** See Fed.R.Civ.P. 44.1; C. Wright & A. Miller, Federal Practice & Procedure § 2444 (1971).

**35.** If, as the defendant's Swiss counsel suggests, the Swiss Bank acquired an enforceable lien on or before August 29, 1973, and that lien continued in the dollars even after they were forwarded to New York, the funds obtained by the New York Bank, while even on this hypothesis the property of AIBC and not the Swiss Bank, would have been subject to the

The expert opinion of Swiss counsel submitted by the Trustee concludes that the August 29 telex could not constitute an assignment to the Swiss Bank because it was not signed by the assignor, and because its text did not sufficiently reflect an intention to assign. Since neither of these propositions are controverted in the analysis submitted by the defendant, the Court's conclusion must be that AIBC did not assign the dollars to the Swiss Bank under the law of Switzerland.[36]

Swiss Bank's prior interest. Their transfer to the defendant, therefore, would not have depleted the assets of the bankrupt available to its unsecured creditors.

Although all the statutory elements of a preference would still have been present, the depletion which is arguably essential to the Trustee's recovery, see *Ricotta v. Burns Coal & Bldg. Supply Co., supra,* would not have occurred.

However, whatever lien the Swiss Bank may have had in the dollars by virtue of the general agreement AIBC had entered into with it (and which is relied upon by defendant's Swiss counsel) was lost when the Swiss Bank relinquished the funds; the Swiss Bank did not place the dollars with the New York Bank as an investment of AIBC's funds still on deposit with it.

**36.** The result would be similar if New York law were applicable. It is true that the August 29 telex appears to satisfy the criteria of an assignment under the common law rule discussed in connection with the other assignment issues, *supra.* That rule provides that a direction given by an assignor to a party indebted to it which designates a third person to whom the debtor should pay the debt constitutes an assignment of the debt to the designee, where he is given notice of the direction. See authorities in note 19, *supra.*

AIBC's August 29 instruction directed the Swiss Bank, indebted to AIBC under the foreign exchange contract, to pay the dollars owed to AIBC to a designee—the Swiss Bank. Since that Bank was both AIBC's debtor and designee, the direction to the former automatically met the requirement of notice to the latter.

Nevertheless, it seems likely that this doctrine may not properly be applied to infer the existence of an assignment where both the assignee and the party indebted to the assignor are the same person. There appears to be no authority in the case law to so apply the rule, and a significant distinction may be drawn between the instant case and the more traditional fact pattern. In a case involving three parties, the assignor's intention to assign is manifested by two separate acts: the order to the debtor, and the notice to the assignee. Since an order alone is insufficient to constitute an assignment, because it is revocable, *see Aetna National Bank v. Fourth National Bank, supra,* the combination of the two acts is essential to manifest the requisite intention.

Although a single act may accomplish the two functions of direction and notice where the identity of the debtor and the assignee is the same it should be as inadequate to manifest an intention to assign the debt as is a single act in the more traditional situation. Otherwise, an instruction which is meant as a "mere direction, revocable . . . at will," *Schreiber v. Keller Mechanical Engraving Co., supra,* may unwittingly be interpreted as an assignment. Hence, it seems prudent to require additional evidence of an intention to create an assignment where there is merely a single act which both instructs a debtor to pay the debt to himself and notifies him of the instruction. No such additional evidence of an intention by AIBC to assign is present in the case at bar.

Finally, this Court need note only briefly that the validity of the August 29 telex under New York law might also be affected by the Uniform Commercial Code, which is potentially applicable. The Code's "statute of frauds," § 9–203, provides that a security interest is valid and enforceable only if the agreement establishing it has been "signed" by the debtor. In the instant case, that requirement may be satisfied only if AIBC's telex "test key" verifying code is deemed equivalent to AIBC's signature under § 1–201(39) of the Code.

The Swiss Bank's failure to comply with the filing requirements of Article 9, if applicable to the transaction, would not be relevant to the instant case, however, since the alleged assignment to the Swiss Bank need not have been perfected prior to November 19 for the funds to be considered the Swiss Bank's property; perfection was accomplished on that date when the Swiss Bank obtained possession of the assigned funds. Compliance with any applicable filing requirements would be relevant if an action were to be brought against the Swiss Bank to recover as a preference the allegedly assigned funds it received on November 19.

The defendant's argument that § 9–104(f) exempts the alleged assignment to the Swiss Bank from the scope of Article 9 is unpersuasive; while that section may literally apply to the instant transaction, it exempts only those contract assignments which, unlike that alleged here, simultaneously delegate the assignor's duty under the contract as well as his rights.

*IV. Conclusions*

Since none of the defenses offered by the New York Bank can be sustained, the Trustee is entitled to recover the preferential transfers received by the Bank.

It may be true that the two transactions the defendant entered into with the bankrupt appeared riskless, since the risk of fluctuation in the foreign exchange rates in the underlying arbitrage contracts was entirely on the Swiss Bank, not on AIBC, and since the series of instructions (revocable) issued by AIBC enabled the defendant to see in May the source of its eventual repayment in November. Yet in relying on a sequence of executory contracts, the Bank's officers made the mistake of assuming that because a secured transaction is riskless, a seemingly riskless transaction must be secured.

The evidence establishes that the defendant had at most an equitable lien on the funds it eventually received as repayment of the loans; under § 60(a)(6) of the Bankruptcy Act, such liens are not sufficient to withstand the attack of the Trustee where "available means of perfecting legal liens have not been employed." *See* 3 *Collier* ¶ 60.49, at 1028–29. The defendant's failure to take the elementary steps which would have entitled it to the status of a secured creditor can only be attributed to its banking practices and procedures.

It is indisputable that the payments to the New York Bank deprived other creditors of significant assets which could otherwise have been equitably distributed, along with the hardships imposed by bankruptcy, among all the bankrupt's unsecured creditors. Accordingly, plaintiff shall recover from defendant each of the sums the latter received on November 2 and 19, 1973, respectively, in payment of defendant's loans to AIBC, with interest and costs, to be calculated and entered by the Clerk, and have execution therefor.

The foregoing shall constitute the Court's findings and conclusions as required by Fed.R.Civ.P. 52(a).

So ordered.